IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. 21CA3951 |
| v. | : | |
| JUAN SALVADOR GUERRERO TORRES, | : | DECISION AND JUDGMENT ENTRY |
| Defendant-Appellant. | : | **RELEASED 4/25/2023** |

_____
APPEARANCES:

Samuel H. Shamansky, Donald L. Regensburger, and Ashton C. Gaitanos, Columbus, Ohio, for appellant.

Shane A. Tieman, Scioto County Prosecuting Attorney, and Jay S. Willis, Assistant Prosecuting Attorney, Portsmouth, Ohio, for appellee.
_____
HESS, J.

{¶1}   Juan Salvador Guerrero Torres appeals his convictions for rape, sexual battery, and gross sexual imposition. For his first assignment of error, Torres contends that his rape and gross sexual imposition convictions must be reversed because there was insufficient evidence that he used "force or threat of force" to compel the victim to engage in sexual conduct or contact. He argues that there was no evidence that he made threats or applied any force to her body or clothing in any way. We find that the state failed to present sufficient evidence of force to sustain Torres's conviction on rape and gross sexual imposition. We sustain his first assignment of error and vacate his convictions for rape and gross sexual imposition. We remand this matter to the trial court to modify Torres's conviction and to resentence him accordingly.

{¶2}   In his second assignment of error, Torres contends that the trial court erred

Scioto App. No. 21CA3951

when it denied his trial counsel's request for a jury instruction on "mistake of fact." He argues that there was sufficient information of equivocal conduct by the victim to give rise to his belief that she was interested and consented to his sexual advances and all three of his convictions should be reversed. Because we sustain his first assignment of error, this argument is moot as to his rape and gross sexual imposition convictions. On his sexual battery conviction, we find that a jury instruction on mistake of fact was not warranted and the trial court did not err when it denied Torres's request for it. Torres presented no evidence that he had an honest belief based in good faith that the victim was awake, aware, and consented to his conduct. We overrule his second assignment of error.

{¶3} Finally, Torres contends that his convictions were against the manifest weight of the evidence and the evidence did not support a finding that he acted with the requisite degree of mental culpability to commit rape, sexual battery, or gross sexual imposition. Again, this assignment of error is moot as to his convictions on rape and gross sexual imposition. We find the state presented substantial evidence upon which the jury could reasonably conclude, beyond a reasonable doubt, that Torres knew that K.S. was sleeping and was unaware of his conduct; the judgment of conviction on sexual battery is not against the manifest weight of the evidence. We overrule his third assignment of error.

{¶4} We remand this matter to the trial court to modify Torres's convictions and to resentence him accordingly.

I. FACTS AND PROCEDURAL HISTORY

{¶5} In January 2020, a Scioto County Grand Jury returned an indictment that charged appellant with (1) one count of rape in violation of R.C. 2907.02(A)(2), a first-degree

felony, (2) one count of sexual battery in violation of R.C. 2907.03(A)(3), a third-degree felony, and (3) one count of gross sexual imposition in violation of R.C. 2907.05(A)(1), a fourth-degree felony.  Appellant entered a not guilty plea.

{¶6}    The case proceeded to a jury trial which produced the following evidence.  The victim, K.S., is in her mid-twenties, lives in Columbus, and is employed as an engineer at a manufacturing company.  On May 30, 2020, K.S. drove to Portsmouth to stay overnight with her friend, Lena Harvey, whom she had met when they both attended college together.  Harvey, her boyfriend, Josh Griffith, and K.S. drove to a bar where K.S. visited with several people she knew from college. They arrived at the bar at approximately 11:00 p.m. and stayed until the bar closed.

{¶7}    During the evening Harvey, Griffith, and K.S. socialized with Torres, whom Harvey and Griffith knew because he worked at a local restaurant they frequented. K.S. was wearing jeans, a tank top, and a long sweater. At one point, K.S. removed her sweater and, when she returned to the table, Torres had it wrapped around his waist and told K.S. he "didn't want [her] to lose it."  K.S., Harvey, and Torres exchanged Snapchat information, and, when the bar closed, all four left the bar together, stopped by Torres's house to pick up alcohol and snacks, and then went to Harvey and Griffith's house. The rest of the evening, the four talked, ate snacks, drank alcohol, listened to music, and danced.

{¶8}    K.S. described the evening:

We were all just hanging out when we first got there and talking. [Torres] had brought some like weird snacks that I tried.  We were listening to music.  And like as the night progressed he started to get - - or he started to make me more uncomfortable, which I didn't realize until later on in the night. * * * I went over to my phone to - - to change the music and he came over there * * * and tried

to kiss me and he was telling me that there is a restaurant in Columbus that he could move to and work at, and I told him he couldn't kiss me and that that was not going to work out.

Q. Okay, do you know what prompted all that?

A. I have no clue. * * * I told him I wasn't interested. [Harvey and Griffith] told I wasn't interested. * * * I went back into the kitchen where [Harvey and Griffith] were and I started to dance with [Griffith] and I was telling him that - - that [Torres] was making me uncomfortable and he was just being really weird, and [Griffith] told me to be nice to him because like this is his first time being over at the house, and like he just wanted all of us to have a good time.

{¶9}    When Torres started to act weird, K.S. "went into the bathroom downstairs so I could FaceTime my friend, Spencer." K.S. described Spencer as "the guy who I was talking to at the time * * *He was pretty much my boyfriend.  We hadn't made it official, but he was pretty much my boyfriend."  While K.S. was in the bathroom on the phone with Spencer, Torres sent K.S. a Snapchat that told her to come out of the bathroom.  K.S. did not answer and told "Spencer how weird it was, and - - that I just wanted to go to bed."

{¶10}  Shortly thereafter, Harvey asked K.S. if everything was okay and if K.S. wanted Torres to leave, and K.S. said, "I don't care if he leaves, but I just - - I don't want to be down here anymore.  I just want to go upstairs and go to bed."  Harvey then walked K.S. upstairs to her room and gave her a phone charger. K.S. removed her jeans and underwear, put on a pair of baggy shorts, plugged her phone into the only outlet, and placed a pillow and blanket on the floor near the outlet so she could charge her phone and continue to Facetime Spencer. According to the phone log, K.S. called Spencer from the bathroom at 3:55 a.m. and that call lasted 38 minutes. Spencer called back at 4:39 a.m. after K.S. was settled in upstairs. K.S. fell asleep while still on FaceTime with Spencer.

{¶11}  When K.S. fell asleep, her door was closed. K.S. testified that she slept "pretty heavy" because she had a few drinks. When she was on the phone with Spencer the second time, Torres sent another Snapchat and asked, "Do u want coddling [sic]." K.S. responded, "I'm sleeping m [sic]." K.S. then told Spencer, "how weird that was, but like I wasn't around him anymore. My - - the door was shut.  I was going to bed." Later, K.S. was awakened:

> When I was sleeping I thought that I felt something inside of me and it was one of those where it's like I didn't know if I was dreaming or I was just kind of in that state of like maybe I'm dreaming or like I think I'm dreaming, and then I - - I don't know how long that went on for, but I kind of like snapped out of it and I opened up my eyes and I was just staring at the ceiling and I realized that this is real life, like this is really happening.  Like, something was really inside of me.
>
> Q. [K.S.], when you say something's inside of you, where are you talking about?
>
> A. I don't know what was inside of me. I just felt something.
>
> Q. Inside you where?
>
> A. Inside my vagina.
>
> Q. * * * What did you do when you realized that this is really happening to you?
>
> A. I set up and [Torres] was like towards the end of my feet, maybe like next to my legs, and I pushed him off and I told him to get away before I freak the "F" out is what I said.
>
> Q. Okay.
>
> A. And he like went to lay next to me on the floor, and he was like no, like come - - come cuddle with me, come cuddle with me, and I repeated myself again for him to get away before I freaked the "F" out, and I was yelling at him to get away. And he had gotten up and went to walk out the door and he had told me he was looking for a charger.

{¶12}  K.S. terminated the phone call she had fallen asleep on with Spencer and then tried to call Harvey. She kept trying to call Harvey but Harvey wasn't answering so she

6

banged on Harvey's bedroom door. As she was pounding on Harvey's door, K.S. testified that Torres "came back up the stairs with the charger and he said I found the charger, and I was like I don't care, like just go - - go away." Harvey's door was locked with a hook latch so K.S. went back to her room, retrieved scissors, unhooked the latch with the scissors, and ran into Harvey's room where Harvey and Griffith were asleep. K.S. woke Harvey and told her what had happened. At that point, they woke Griffith and asked him to go downstairs and make Torres leave. After Griffith returned upstairs, Griffith, Harvey, and K.S. went downstairs and K.S. told Torres, "you know what you did to me, and his response was that he was drunk and he doesn't remember. And I told him drunk or not it doesn't make it right and that he needs to go." K.S. then called her sister, who told her to call the police.

{¶13} On cross-examination, counsel asked K.S. if she remembered dancing with Torres and "backing your rear up to [Torres] and dancing with your rear against him?," and K.S. replied, "I remember him pulling my [sic] close - - waist closer to him." K.S. testified that Torres was showing them how to salsa dance, that their bodies were close, and that she was dancing up against Torres later that evening in the kitchen. K.S. also testified on cross-examination that after she went upstairs to the guest bedroom and took off her jeans and underwear, she put on baggy shorts that "were like sweat pants that I had cut into shorts." She agreed that they were "fairly loose." A photograph of the shorts was admitted into evidence.

{¶14} When cross-examined about the rape incident, K.S. testified:

A. I felt something inside of me, yes.

Q. And you saw [Torres] and you told him to leave; right, or stop?

A. I sat up and I pushed him off of me and told him to get away before I freak out.

Q. And he did stop; right?

A. He had laid - - he laid next to me and ask [sic] me to come cuddle with him.

Q. The sensation that you felt had stopped when you said stop?

A. I never told him to stop. * * * I had woken up and I still had felt something inside of me and when I realized that it was real life, that I was actually awake and something was inside of me, when I had sat up [Torres] was by my legs.

Q. But you said stop; right?

A. I told him to get away from me before I freaked the "F" out is what I said to him.

Q. Okay. And he did as you told him to do; right?

A. He laid next to me - - * * * - - and I told him again to get away from me before I freaked the "F" out.

{¶15}  Lena Harvey and her boyfriend Josh Griffith live at the Franklin Avenue house, and Harvey testified that she has been friends with K.S. since 2016.  On the day in question, Harvey, Griffith, and K.S. drove to a bar around 11:00 p.m. to meet with friends.  While there, they ran into Torres. Harvey, Griffith, and K.S. sat at Torres's table and talked and drank alcohol for about an hour. Harvey and Griffith knew Torres because he worked at a restaurant they frequented. Harvey, Griffith, Torres, and K.S. left the bar together and stopped by Torres's house to get alcohol and snacks on their way back to Harvey and Griffith's house.

{¶16}  At Harvey and Griffith's house, the group stood in the kitchen and drank, talked, and listened to music. Around 3:00 or 4:00 a.m., K.S. visited the downstairs bathroom and was on the phone. K.S. was the first to go to bed, then Harvey and Griffith soon followed.

{¶17}  Harvey observed that early in the evening, everything appeared to be "fine"

Scioto App. No. 21CA3951

between Torres and K.S. but, "[w]hen she [K.S.] went to the bathroom and was talking with the guy that she was talking to, she was in there and she * * * had the door shut and [Torres] kept like trying to like get her to come out, was asking us, like, 'Hey, go get her. Come out.' He was trying to open the door and stuff, and she was just uncomfortable with that."

{¶18} Harvey testified that K.S. went to the upstairs guest bedroom and closed her door. Harvey and Griffith went to their upstairs bedroom. Torres had the use of the downstairs couch. After Harvey fell asleep, she awoke when K.S. came into her room crying and got into bed. K.S. "could like barely breathe * * * she kept like trying to talk and was like not able to talk. Like, she just couldn't breathe. She was like gasping for air, crying."

{¶19} At that point, Harvey told Griffith to go downstairs to speak to Torres. Eventually, Harvey and K.S. also went downstairs to speak with Torres. Torres denied what K.S. had said, and Griffith then asked him to leave. Harvey told K.S. to call her older sister, who advised K.S. to call the police.

{¶20} Josh Griffith testified that he had known K.S. for about three years. On the evening in question, they went to a bar where they ran into Torres. After the group returned to Griffith's house and prepared for bed, Griffith told Torres he could "crash" on his couch and gave him a blanket. Griffith also told Torres to use the upstairs bathroom because they kept their dogs in a caged area by the downstairs bathroom, which made that bathroom inaccessible.

{¶21} Griffith and Harvey slept in their bedroom until K.S. came into their room crying. Griffith stated he "couldn't even understand what she was saying." Griffith confronted Torres, and Torres told him that he went upstairs to use the bathroom, but denied that he touched

K.S. After Griffith talked to K.S. and Harvey, all three confronted Torres. Torres continued to deny the accusations, and Griffith asked him to leave. Griffith then observed Torres walk down the street and "grab his hair and throw his hands down." Later, Torres sent Griffith a text that said, "Hey, I so sorry idk wha happened…. I never want respect her or u house …. So drunk I feel like trust." The text contained three tear-faced emojis and two sad-faced emojis and went on, "I never want be drunk like last night if she want punch me is fine … idk what r do …. Alcohol control me …. Call me later." Griffith did not respond to Torres's message.

{¶22} Earlier in the evening before the incident occurred, Griffith also observed that Torres appeared "probably a little tipsy," but was not "trashed," walking and talking fine, and was able to be understood in the morning before he left. Griffith further stated that when K.S. went to bed, she was "fine," "nobody was trashed." Griffith also testified he did not see K.S. being flirtatious with Torres, but recalled that Torres expressed his interest in K.S. to Griffith "multiple times that night." Griffith, however, told him "she is not interested, because I mean, I don't - - you get those vibes, you know, she's not interested."

{¶23} Portsmouth Police Officer Tori Galloway testified that she received a call at 6:40 a.m. on May 31, 2020 and spoke to K.S., who stated that Torres had sexually assaulted her. Galloway arrived at the Franklin Avenue home and found K.S. "noticeably upset, crying hysterically, very difficult to understand." Galloway obtained a written statement and transported K.S. to Southern Ohio Medical Center. After a brief conversation with K.S. at the hospital, Galloway returned to the Franklin Avenue home to talk with Griffith and Harvey about the incident. Galloway also visited Torres's house and he agreed to go to the police

Scioto App. No. 21CA3951

station for questioning.

{¶24}  Portsmouth Police Detective Steven Timberlake testified that, after he received a call on May 31, 2020, he drove to the hospital and found K.S. crying, "noticeably distraught, upset, kind of hard to talk to." Detective Timberlake then drove to the Franklin Avenue home and removed a comforter from the floor of the bedroom K.S. had slept in.

{¶25}  Detective Timberlake also interviewed Torres and described him as calm.  The state played Timberlake's interview with Torres for the jury. In it, Torres stated that he drank with Harvey and Griffith and Harvey's friend, whose name he did not remember.  They then visited Harvey and Griffith's house.  When asked if he remembered lying beside K.S., he replied, "I don't remember. (Inaudible) I told her I don't know what happened.  I don't remember nothing." When asked how much he drank, Torres stated, "I drink like (inaudible) like three bottles of beer (inaudible) and maybe eight shots (inaudible) at these guys house and drinking (inaudible) wine, because they stopped by my house and get more beer."

{¶26}  Torres denied that he inserted his penis inside K.S., but when asked if he "put his fingers inside her," he replied, "she say my fingers inside, but I like - I don't remember." When asked if he "lay down beside her," Torres stated, "I don't remember what happened. Like, I remember go to bathroom and come and - - the last I know I was in the floor and laid down." Torres acknowledged that he sent a text message to Griffith after he had been asked to leave and he explained that he meant that he never wanted to "disrespect" K.S. or Griffith but mistakenly typed "respect" and that when he typed "I feel like trust" he meant "I feel like trash." When Detective Timberlake noted that he texted, "she [K.S.] could punch you," Torres responded, "Yeah (inaudible) she was so angry (inaudible) punch me something I do, so - -

Scioto App. No. 21CA3951

so okay (inaudible)." Torres told Detective Timberlake that, after he went to the upstairs bathroom, he entered K.S.'s room to look for a phone charger because his phone was dying and he remembered the charger was on the floor. Torres also acknowledged that what K.S. said could have occurred because he was drunk and does not remember. Detective Timberlake obtained Torres's DNA samples.

{¶27} Registered Nurse Emilee Metzler, Sexual Assault Nurse Examiner at the Southern Ohio Medical Center, examined K.S. on May 31, 2020. Metzler testified that K.S. had elevated blood pressure and pulse, and was "tearful while speaking," "fidgety," "seemed to have a hard time making eye contact," "just kind of looked down." Metzler testified that K.S. told her that when she positioned herself on the floor in her friend's spare room to charge her phone and Facetime her friend, appellant Snapchatted her to ask if she wanted to cuddle, and K.S. told him no and continued to talk to her friend until she fell asleep. K.S.'s report to Metzler continued:

> And then I thought I was just dreaming, but I felt something inside me, and I don't know how long it went on for, but when I woke up [Torres] was laying next to me in the floor. I told him once get off of me before I freak the fuck out, and I started pushing him off me, and he said he just wanted to cuddle. Then I told him again to get out. I started to yell and he said - - said he just wanted a charger. He went down the stairs and then I was banging on my friend, Harvey's door to let me in, and it was like locked with a hook. So, I started to stick anything through to get the hook up.

{¶28} Metzler testified that she completed her exam, collected oral, vaginal, and perianal swabs and a swab from a dried stain. Metzler testified that K.S. believed Torres assaulted her with his fingers. Metzler explained that the electronic form that she completes that describes the assault asks for specific forms of force used. Because K.S. was not held

at gunpoint or knifepoint and not restrained by a rope, the form automatically generates a response that no force was used. In addition, Metzler testified she did not learn from K.S. that any other type of force was used:

Q. But you didn't get any information from the patient that there was any other sort of physical force; is that right?

A. No.

Q. She never told you she was held down?

A. No.

Q. Or restrained in any way?

A. No.

**{¶29}** Ohio Bureau of Criminal Investigation Forensic Scientist Malorie Kulp testified that she compared DNA from interior and exterior vaginal samples and the interior crotch area of K.S.'s shorts. The DNA sample taken from the interior crotch of the victim's shorts revealed a mixture of DNA profiles consistent with K.S. and Torres, with an estimated frequency statistic of one in 200,000,000 unrelated individuals.

**{¶30}** At the close of the state's case, Torres moved for acquittal as to all counts pursuant to Crim.R. 29. Torres argued (1) the state failed to prove the element of "force or threat of force," (2) the state failed to prove the element of "knowingly" regarding the sexual battery offense, and (3) insufficient evidence of sexual contact exists to prove the offense gross sexual imposition. The trial court denied the motion.

**{¶31}** Torres testified in his defense and stated that he is 35 years old, from Mexico, has lived in the U.S. for 14 years, and moved here so he could earn money to send to his

elderly parents still residing in Mexico. He has spoken English for approximately eight years. Torres has resided in Portsmouth for approximately four years and was previously married to a woman with two daughters and considers those children as his own. He currently works at a restaurant in Portsmouth. Torres testified that he knew Harvey and Griffith from the restaurant and considered them friends.

{¶32} On May 30, 2020, Torres was at a bar and saw Griffith, Harvey, and K.S. there. Torres learned that K.S. lived in Columbus and they exchanged Snapchat information. Torres stated that he thought K.S. had an interest in him because she loaded her Snapchat information on his phone and sent herself a message to request to add Torres to her Snapchat, and Harvey did as well.

{¶33} Torres testified that after the bar closed, they all decided to go to Harvey and Griffith's house, but they stopped by Torres's house to pick up beer, wine, and snacks. They got to Harvey and Griffith's house at approximately 3:00 a.m. where they ate, drank, talked, listened to music, and danced. Torres asked Griffith "to ask her [K.S.] if I - - I could have any hope with her." Torres thought K.S. was interested in him because "the first time I see her and she always like next to me or like on top of me." Torres, however, said Griffith told him that K.S. had no interest in him.

{¶34} Torres further testified that K.S. danced with him while Harvey and Griffith danced together in the kitchen, and that K.S. "put the hands on the table and she * * * put her backside bottom on me" and "put her hands around like that and touched my bottom side" and "when she's dancing with me my penis gets hard * * * and she would slide from where the penis is to the knees, and she would go up and down, and up and down. And

Harvey and Griffith, they were nearby and they were watching them."

{¶35} Torres also recalled that he tried to kiss K.S., and K.S. continued to dance with him after he tried to kiss her. After K.S. went upstairs to bed, Torres said he needed to use the upstairs bathroom because Griffith told him he could not use the downstairs bathroom.

> And at that time my telephone was going to lose its charge, so I went upstairs and I knocked on the doors.  The first door was open.  Not all open, but a little bit, and then I went to a second door and I - I yelled for Griffith, and then after nobody answered and I was going back and K.S. there lying on the floor.

{¶36} Torres stated that, while K.S. was on her side with her face toward the wall, he laid down next to her. "When I got there and I laid down next to her I was still thinking that she was interested in me * * * so I gently touch her hand." Torres continued:

> I touch her two or three times right here and since she didn't say anything I touch her neck and it was like she was trying to say, yes, okay, go ahead and do that, because she was like breathing harder.  Breathing but not as fast as sounds of sex, but the breathing that - - I don't know how to describe it.  Well, like when two people are touching or kissing and the breathing goes harder and the heart is going faster and I continue because she doesn't say anything because it felt harder.

{¶37} Torres stated that K.S. "got close next to mine, touching me," and when he touched her breast, "she moved her foot on top of my feet." Torres said he believed she wanted him to touch her, but K.S. told him to stop and "she said get away from me." Torres said he then ceased his activity and walked downstairs.

{¶38} When asked about his understanding of what had occurred, Torres stated, "Yeah, because she was the one that provoked all that through the night, so I was going step by step to see how far we would go. So, that's when she was there I tried and then if she - - she said no then I stopped at that moment." When asked if he "put your hand

down in her pants," Torres replied, "[s]ee when she put her foot on top of me that's when I started feeling that she was breathing harder. I can feel her and that's when I had actually started touching her hand, then her neck, and then onward, and that's when she says, stop, and then I stopped." Torres acknowledged that he touched K.S.'s breast, but said "when my hand was going down I don't know how far it had gone. I don't remember." Torres acknowledged that his trial testimony differed from what he initially told Detective Timberlake because he had been confused and nervous.

**{¶39}** At the close of Torres's case, the defense renewed, and the trial court denied, the Crim. R. 29 motion for judgment of acquittal. The trial court also denied Torres's request to provide the jury with a "mistake of fact" instruction.

**{¶40}** The jury found Torres guilty of all charges. When the trial court sentenced him, the court merged the three charges as allied offenses of similar import, and the state elected to proceed with the sentence on the rape offense. The court sentenced Torres to: (1) serve in prison a minimum term of 8 years and an indefinite maximum term of 12 years, (2) pay a $2,500 fine, (3) pay $20 restitution, and (4) pay all costs and fees. The trial court classified Torres as a Tier III Sex Offender/Child Victim Offender Registrant and required him to fulfill all requirements of the classification for a lifetime with in-person verification every 90 days. Torres appealed.

## II. ASSIGNMENTS OF ERROR

**{¶41}** Torres assigns three errors for review[1]:

---

[1] We take the assignments of error from the main section of Torres's brief. The assignments of error section contained on page four of his brief sets out different assignments of error from those set out in the main argument section, assignments of error one and two are identical, and none of them raise the error concerning insufficiency of the evidence on the element of force as to the rape and gross sexual

I. Appellant was convicted in the absence of evidence sufficient to support findings of guilty in violation of his rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution

II. The trial court erred by refusing to give the jury an instruction on mistake of fact, thereby depriving Appellant of his rights to due process and a fair and impartial jury as guaranteed by the United States and Ohio Constitutions.

III. Appellant's convictions were against the manifest weight of the evidence in violation of his right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.

### III. LEGAL ANALYSIS

#### A. Insufficient Evidence of Force or Threat of Force

{¶42} In his first assignment of error, Torres argues that the jury could not have found him guilty of rape in violation of R.C. 2907.02(A)(2) and gross sexual imposition under R.C. 2907.05(A)(1) because there was no evidence that he purposely compelled K.S. to submit by force or threat of force.

{¶43} Torres asserts that insufficient evidence supports his conviction for rape and gross sexual imposition because the evidence adduced at trial did not prove that he purposely compelled K.S. to submit by force or threat of force.

#### 1. Standard of Review

{¶44} "When a court reviews the record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond

imposition convictions.

a reasonable doubt.'"  *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Bennington,* 2019-Ohio-4386, 148 N.E.3d 1, ¶ 11 (4th Dist.).

**{¶45}**  An appellate court must construe the evidence in a "light most favorable to the prosecution."  *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. Grant*, 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993).  Further, "[t]he court must defer to the trier of fact on questions of credibility and the weight assigned to the evidence."  *State v. Dillard*, 4th Dist. Meigs No. 13CA9, 2014-Ohio-4974, ¶ 22, citing *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 132; *State v. Lodwick*, 2018-Ohio-3710, 118 N.E.3d 948, ¶ 9 (4th Dist.).  Thus, "a reviewing court is not to assess 'whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.'"  *State v. Davis*, 4th Dist. Ross No. 12CA3336, 2013-Ohio-1504, ¶ 12, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997) (Cook, J., concurring).  Rather, a reviewing court will not overturn a conviction on a sufficiency of the evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did.  *State v. Tibbetts*, 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); *State v. Treesh*, 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

2. Elements of Rape and Gross Sexual Imposition

**{¶46}**  Rape is defined in R.C. 2907.02(A)(2) as: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."  Gross sexual imposition is defined in R.C. 2907.05(A)(1) as:

(A) No person shall have sexual contact with another, not the spouse of the

offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

(1) The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force. * * *.

R.C. 2907.01(B) defines sexual contact:

'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

R.C. 2907.01(A) defines sexual conduct:

'Sexual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

**{¶47}** As set forth above, both R.C. 2907.02(A)(2) rape and R.C. 2907.05(A)(1) gross sexual imposition require the state to prove that a victim submitted "by force or threat of force." "Force" means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing. R.C. 2901.01(A)(1). "[T]he use of the word 'any' in the definition recognizes there are different degrees of force." *State v. Clark*, 8th Dist. Cuyahoga No. 90148, 2008-Ohio-3358, ¶ 17. "'[S]ome amount of force must be proven beyond that force inherent in the crime itself.'" *State v. Zimpfer*, 2d Dist. Montgomery No. 26062, 2014-Ohio-4401, ¶ 46, citing *State v. Dye*, 82 Ohio St.3d 323, 327, 695 N.E.2d 763 (1998). However, "[a]ny amount of physical force or threat, however slight, is sufficient to support * * * " a rape conviction under R.C. 2907.02(A)(2). *State v.*

*Heiney,* 2018-Ohio-3408, 117 N.E.3d 1034, ¶ 122 (6th Dist.). "The force element needed to prove the offense of gross sexual imposition is the same as it is for rape." *State v. Biggs*, 2022-Ohio-2481, 192 N.E.3d 1306, ¶ 16 (5th Dist.).

**{¶48}** The Supreme Court of Ohio found the amount of force required to meet this requirement varies depending on the age of the victim and the relationship between the victim and the defendant. *State v. Eskridge,* 38 Ohio St.3d 56, 58, 526 N.E.2d 304 (1988). However, some amount of force must be proven beyond the force inherent in the crime itself. *State v. Dye*, 82 Ohio St.3d 323, 327, 695 N.E.2d 763, 766 (1998).

**{¶49}** In a situation very similar to the one here, the appellate court held that the state failed to prove "force" beyond a reasonable doubt, reversed the defendant's gross sexual imposition convictions, and remanded the matter for the trial court to enter a conviction on the lesser charge of sexual imposition. *State v. Wine,* 3d Dist. Auglaize No. 2-12-01, 2012-Ohio-2837. In *Wine*, the adult female victim was asleep and wearing only loose fitting flannel pajamas without underwear. The victim testified that the pajamas were "large * * * [t]hey don't bind you around the body," "very loose" and not tight around her waist or body. *Id.* at ¶ 10. When she awoke, the defendant was very close to her face, kneeling down by her bed, and she realized his finger was in her vagina and his right hand was under her pajamas on her chest. The victim testified, "When I yelled he took his finger out of my vagina and took his hand out from underneath my pajama top but he kept his hands under the blankets and he just kept staring at me." *Id.* Shortly thereafter the defendant left the bedroom.

**{¶50}** The appellate court recognized that a lesser degree of force may be shown where the victim is a child as in *Eskridge* and *Dye, supra.* However, because the victim,

S.D., was an adult and the defendant, Wine, was not in a position of authority over her, the state "was required to prove beyond a reasonable doubt that Wine 'use[ed] physical force against [S.D.], or create[d] the belief that physical force [would] be used if [S.D.] [did] not submit' to establish the element of force." The court reviewed the evidence and concluded that the state had failed to prove the element of force:

> The evidence presented at trial demonstrated that S.D. was sleeping and unaware of the sexual contact, and, as soon as she awoke, Wine withdrew his hands from her body, ending the sexual contact. Significantly, no sexual contact occurred after S.D. was awake and aware of the sexual contact. S.D.'s will was not overcome by force or threat of force, nor did S.D. "submit" to the sexual contact by force or threat of force. *Eskridge*, 38 Ohio St.3d at 58–59, 526 N.E.2d 304. The State also failed to produce sufficient evidence that Wine created the belief that physical force would be used if S.D. did not submit to the sexual contact. *Schaim,* 65 Ohio St.3d at 55, 600 N.E.2d 661. While it is true that S.D. was in a state of fear and duress after she awoke and realized Wine had sexually contacted her, S.D.'s fear and duress did not cause her to submit to the initial sexual contact or any further contact. Aside from that, S.D. did not fear that Wine would continue the sexual contact but that Wine would kill her to conceal his already completed sexual contact. For these reasons, we conclude that the evidence is insufficient to establish that Wine purposely compelled S.D. to submit to the sexual contact by (through the agency or instrumentality of) force or threat of force.

*Id.* at ¶ 47.

**{¶51}** The appellate court in *Wine* acknowledged that the Eighth District Court of Appeals has held that "any manipulation of a sleeping victim's body or clothing is sufficient force for purposes of rape in violation of R.C. 2907.02(A)(2)," but the court stated, "we are not persuaded to follow that line of cases." *Id.* at ¶ 48.

> We decline to adopt the Eighth District's reduced level of force for sleeping victims for several reasons. To begin with, the reasoning in the Eighth District's line of cases stems from *Eskridge* where the victim was the offender's four-year-old daughter. The Ohio Supreme Court has limited the application of *Eskridge's* reduced levels of force to situations where the offender is the victim's parent or holds a similar position of authority over a child-victim. *Schaim*, 65 Ohio St.3d at 55, 600 N.E.2d 661; *Dye,* 82 Ohio

St.3d at 329, 695 N.E.2d 763. Other districts that have applied a reduced level of force for sleeping victims have done so only in cases involving child-victims. *State v. Johnson*, 2nd Dist. No.2009–CA–38, 2010–Ohio–2920, ¶ 18 (16 year-old); *State v. Burton,* 4th Dist. No. 05CA3, 2007–Ohio–1660, ¶ 38 (10–13 years old); *State v. Green,* 5th Dist. No. 01CA–A–12–067, 2002–Ohio–3949, ¶ 61 (16 year-old); *State v. H.H.,* 10th Dist. No. 10AP–1126, 2011–Ohio–6660, ¶ 12 (17 year-old); *State v. Rutan*, 10th Dist. No. 97APA03–389 (Dec. 16, 1997), *11 (14–15 year-olds). The Eighth District's focus upon "force necessary to facilitate the act" also ignores the fact that "the statute requires that some amount of force must be proven beyond that force inherent in the crime itself." *Clark*, 2008–Ohio–3358, at ¶ 17; *Dye,* 82 Ohio St.3d at 327, 695 N.E.2d 763. The statute requires that the victim submit to the sexual contact by force or threat of force. R.C. 2907.05(A)(1). This requires more than "force necessary to facilitate the act" but force or threat of force sufficient to overcome the will of the victim. *Eskridge*, 38 Ohio St.3d at 58–59, 526 N.E.2d 304.

*Id.* at ¶ 49.

**{¶52}** The *Wine* court also rejected the Eighth District's interpretation of the element of force in sleeping-victim cases, because it "fails to recognize the requirement that the force or threat of force must be sufficient to overcome the will of the victim," thus blurring the distinction between sex offenses requiring force and sex offenses not requiring force. *Id.* at ¶ 50.

The General Assembly has provided specific criminal offenses to protect victims, like S.D., "whose ability to resist * * * is substantially impaired because of a * * * physical condition" or who submit because they are "unaware that the act is being committed." See R.C. 2907.02(A)(1)(c); 2907.05(A)(5); 2907.03(A)(3). The Court of Appeals has concluded that sleeping is a 'physical condition' that substantially impairs a victim's ability to resist for purposes of rape in violation of R.C. 2907.02(A)(1)(c). For the same reason, an offender may also be convicted of committing gross sexual imposition against a sleeping victim under R.C. 2907.05(A)(5). Similarly, an offender may be convicted of committing sexual battery or sexual imposition against a sleeping victim under R.C. 2907.03(A)(2), (3) or R.C. 2907.06(A)(3). By diminishing R.C. 2907.05(A)(1)' s element of force to mere manipulation of a sleeping victim's body or clothing, the Eighth District usurps the General Assembly's power to define and codify criminal offenses and to treat offenders differently depending upon the nature of their conduct. (Citations omitted.)

*Id.*

**{¶53}** Courts have found sufficient evidence of force where the state presents evidence that the defendant manipulated both the victim's body and the victim's clothing during the sexual contact or conduct; but not where "there is no evidence in the record Appellant employed any force or threat of force beyond the force of the act itself, which is legally insufficient to meet the 'force' element of the crime of gross sexual imposition." *State v. Biggs*, 2022-Ohio-2481, 192 N.E.3d 1306, ¶ 17, *appeal not allowed*, 168 Ohio St.3d 1457, 2022-Ohio-4201, 198 N.E.3d 871 (citing cases from the Second, Fifth, Eighth, and Tenth Districts involving facts where the victims' bodies and clothing were moved). In *Biggs*, Biggs appealed his conviction for gross sexual imposition arguing that the state failed to prove the element of force. The appellate court agreed, modified his conviction for gross sexual imposition to the lesser included offense of sexual imposition, and remanded for resentencing. Biggs and the victim, A.I., were lying on a bed watching a movie when Biggs slid over, whispered in her ear, licked her ear, and then "stuck his hand down the front of A.I.'s pajama pants, inside her underwear, and began massaging the outside of her vagina." *Id.* at ¶ 6. The court held that the state failed to prove sufficient evidence force beyond that necessary to commit the offense.

> The instant case involves an adult victim, who was not asleep. There was no evidence Appellant removed A.I.'s clothing or manipulated her clothing beyond reaching inside her pajama pants and underwear. Appellant did not tell the victim to do anything or refrain from doing anything, and did not threaten her in any way if she failed to comply. Appellant did not move or manipulate the victim herself, or any of her limbs. There was no testimony Appellant held her down in order to commit the act of touching her. While A.I. testified she forcibly removed Appellant's hand from inside her pajama pants, there is no evidence he struggled with her to continue touching her; rather, she was able to leave the room without interference from Appellant. Although A.I. was flustered, crying, and scared because she did not expect

the touching to happen, there is no evidence in the record Appellant employed any force or threat of force beyond the force of the act itself, which is legally insufficient to meet the "force" element of the crime of gross sexual imposition. We find the evidence legally insufficient to convict Appellant of the crime of gross sexual imposition.

*Id.* at ¶ 22.

**{¶54}** The appellate court compared the similarities in *Biggs* with that in another case it had recently decided, *State v. Moore*, 5th Dist. Morgan No. 21AA0003, 2022-Ohio-2349. In *Moore,* the defendant had reached inside the shorts of his sleeping 16-year-old niece, Z.M., but had not restrained her, moved her body or limbs, verbally threatened her, or repositioned her clothing in any way other than which was required to insert his hand inside her shorts. The appellate court found that the State failed to prove the element of force required for gross sexual imposition:

Against that background, even if we were to adopt the Eighth District's reduced level of force for initially sleeping victims, we find the facts here are distinguishable from any of the above-mentioned sleeping child-victim cases which appear to require manipulation of clothing plus something more, such as relocation of the victim or repositioning of the victim's limbs. While appellant did manipulate Z.M.'s clothing, as soon as Z.M. became aware of the nature of appellant's conduct, she got up and left the room. Appellant did not tell Z.M. to do or refrain from doing anything, did not restrain her in any way nor reposition or relocate her body in any way, and did not prevent Z.M. from leaving the room. He did not hold Z.M. down in order to commit the act of touching Z.M. While we find appellant's conduct despicable, we nonetheless find the evidence presented by the state insufficient to prove force or threat of force. Additionally, while appellant's conduct would meet the elements of gross sexual imposition under R.C. 2907.05(A)(5) or sexual imposition pursuant to R.C. 2907.06(A)(1), the state did not charge under these code sections nor request to amend the indictment nor request a jury instruction for the lesser-included offense of sexual imposition. (Record citation omitted.)

*Biggs* at ¶ 20, quoting *Moore* at ¶ 38.

**{¶55}** Here the state argues that the situation between Torres and K.S. is

analogous to that between the defendants and their victims in *State v. Burton,* 4th Dist. Gallia No. 05CA3, 2007-Ohio-1660 and *State v. Mynes*, 4th Dist. Scioto No. 12CA3480, 2013-Ohio-4811. However, both *Burton* and *Mynes* involved child victims, ages 12 and 17 respectively, and adult defendants with a special relationship over their victims. We recognize that in child-victim cases, *Eskridge* holds that the force need not be overt or physically brutal and that subtle or psychological pressure can cause a child victim to be overcome by fear or duress. *State v. Eskridge*, 38 Ohio St.3d 56, 59; *Burton* at ¶ 37.

{¶56} In *Burton*, the defendant manipulated both the child victim's clothing and the child victim's sleeping body into a position to facilitate sexual conduct. *Burton* at ¶ 42. We held that "[t]his physical manipulation required force, however minimal, beyond that inherent in the act of rape itself." However, we found that additional factors contributed to the finding of force, including "the victim's will was also overcome by Burton's relative size and age, by the victim's fear resulting from his lack of understanding of an orgasm and his high level of intoxication, and by Burton's position of authority established via his law enforcement officer training, his ability to drive, his relationship with [the victim], and his ability to provide the victim with an expensive gift." *Id.* Burton also had a uniform, carried a firearm, and had transported and isolated the victim in a hotel room, which would constitute additional subtle psychological factors of control and authority that would inflict fear and duress in the child victim. *Id.* at ¶ 39.

{¶57} In *Mynes*, we concluded that the state adduced sufficient evidence to prove that Mynes purposely compelled the victim, the 17-year-old daughter of the defendant's friend, to submit by force or threat of force. *Id.* at ¶ 17. The victim knew the defendant, considered him as a brother, and the victim was not at grade level and was described

intellectually and developmentally as "very childlike." *Id.* at ¶ 17. When we viewed the evidence in a light most favorable to the prosecution, we concluded that a rational trier of fact could have found that Mynes purposely compelled the victim to submit by force or threat of force:

> Thus viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that Mynes purposely compelled C.J. to submit by force or threat of force. C.J. testified that she did not resist because of Mynes' size and her fear that he might hurt her. C.J.'s father also testified that she is developmentally "slow" and very withdrawn. Both Vestich and Conkel testified that C.J. has a "very childlike" demeanor and Vestich testified that C.J. does not have the maturity level of an average 17–year–old. The evidence also showed that C.J. is in special education classes and has failed both her high school classes and the written portion of the driver's exam. From this evidence the jury could infer that her will was overcome by fear due to Mynes' relative size, age and maturity level.

*State v. Mynes*, 4th Dist. Scioto No. 12CA3480, 2013-Ohio-4811, ¶ 17.

**{¶57}** Here, K.S. was not a child, but an adult in her mid-twenties. She testified that she was wearing very loose shorts that she had made by cutting off sweat pants and she was not wearing underwear. There was no evidence that Torres moved or manipulated K.S.'s body and no evidence that he moved or manipulated her clothing. The state concedes there was no direct evidence that Torres moved K.S.'s clothing, but argues that this element of the crime could be presumed. In its brief, that state argues, "Here, the overwhelming credible evidence showed Appellant did not knock or ask to enter the bedroom where [K.S.] slept. Rather, Appellant pushed the door open and lay down next to the victim before proceeding to insert his fingers into her vagina *after presumably moving her loose-fitting shorts*." (Emphasis added.) In response to Torres's Crim.R. 29 motion, at trial the state argued that circumstantial evidence proved the force element, "we have a sleeping victim * * * who is clothed fully, * * * so based on that the

circumstantial evidence would suggest that there had to be some manipulation of clothing or her body to facilitate this offense." However, as we explain below, because K.S. wore loose shorts and no underwear, Torres may not have been required to manipulate the shorts. And, there was no evidence that Torres was required to manipulate or move K.S.'s body to facilitate the offense.

**{¶58}** We find that the analyses in *Wine, Biggs,* and *Moore, supra* to be instructive and relevant here where the victim is not a child and the considerations relevant to child victims as recognized in *Eskridge,* and *Dye, supra* are inapplicable. As the court in *Wine* explained, "The Ohio Supreme Court has limited the application of *Eskridge* 's reduced levels of force to situations where the offender is the victim's parent or holds a similar position of authority over a child-victim." *Wine,* 2012-Ohio-2837, ¶ 49, citing *State v. Schaim*, 65 Ohio St.3d at 55, 600 N.E.2d 661 and *Dye*, 82 Ohio St.3d at 329, 695 N.E.2d 763. The statute requires that the victim submit to the sexual contact by force or threat of force. This requires more than "force necessary to facilitate the act" but force or threat of force sufficient to overcome the will of the victim. *Id.*

**{¶59}** The evidence presented at trial demonstrated that K.S. was sleeping and unaware of the sexual conduct, and, as soon as she awoke, Torres withdrew his finger from her vagina, ending the sexual conduct. Torres did not tell K.S. to do anything or refrain from doing anything, and did not threaten her in any way if she failed to comply. There was no testimony that Torres held her down. There is no evidence he struggled with her. K.S. testified that was able to leave the room without interference from Torres. No sexual conduct or contact occurred after K.S. was awake and aware of Torres's presence. K.S.'s will was not overcome by force or threat of force, nor did K.S. "submit"

to the sexual conduct by force or threat of force. We find the evidence legally insufficient to convict Torres of the crime of rape and gross sexual imposition.

**{¶60}** Even if we were to adopt the Eighth District's reduced level of force for initially sleeping victims as discussed and criticized by *Wine, Biggs* and *Moore*, the facts here are distinguishable from the sleeping-child victim cases which require manipulation of clothing and something more, such as moving the victim or repositioning the victim's limbs. There was no evidence Torres removed K.S.'s clothing or manipulated her clothing. We know that Torres reached into her sweat shorts, but the record does not establish whether Torres reached up into the loose leg of her shorts or down into the waist of her shorts. Thus, it is not known whether any clothing manipulation was required for Torres to commit the act. Even if we presume Torres moved her shorts slightly, the reduced level of force adopted by the Eighth District also requires the manipulation or movement of the victim's body. Here, there was no evidence Torres moved or manipulated K.S. or any of her limbs. When K.S. awoke, sat up, and confronted Torres, he immediately removed his finger. Although K.S. was crying and had difficulty speaking, there is no evidence that Torres employed any force or threat of force beyond the force of the act itself, which is legally insufficient to meet the "force" element of the crime of rape and gross sexual imposition under R.C. 2907.02(A)(2) and R.C. 2907.05(A)(1). Thus, even under the reduced standard adopted by the Eighth District, we find the evidence legally insufficient to convict Torres of the crime of rape and gross sexual imposition.

**{¶61}** Similarly, to the extent the jury based its conviction of gross sexual imposition on Torres's touching of K.S.'s breast, it is not supported by the evidence because there is no evidence that Torres used force to cause K.S. to submit to this

touching. Again, K.S. testified that she was asleep and there was no evidence that she was awake or aware that Torres had touched her breast. She did not testify that her breast had been touched. Torres admitted that he touched K.S.'s breast, but he did not testify that he used force or that he manipulated or moved K.S.'s body and clothing to do so. The record contains no evidence concerning whether Torres touched K.S.'s breast by inserting his hand under her shirt or if he touched it over the outside of her clothing. Thus, there is no evidence that Torres moved her clothing, even minimally, to touch her breast.

**{¶62}** We find Torres's conduct reprehensible, but the evidence presented by the state, viewed in a light most favorable to the prosecution, is insufficient to prove force or threat of force. Furthermore, " 'sleep' is a mental or physical condition, which is sufficient to substantially impair a victim's ability to consent to or resist sexual conduct or contact." *State v. Hines*, 2018-Ohio-1780, 112 N.E.3d 10, ¶ 20 (12th Dist.) (citing cases from the Third, Fifth, Eighth, Ninth, and Tenth Districts). Therefore, Torres's conduct would meet the elements of rape under R.C. 2907.02(A)(1)(c) and gross sexual imposition under R.C. 2907.05(A)(5), but the state did not charge under these code sections, request to amend the indictment, or request a jury instruction for the lesser-included offense of sexual imposition.

**{¶63}** We sustain Torres's first assignment of error. We reverse and vacate his convictions for rape and gross sexual imposition and we remand to the trial court for a modification of his convictions and resentencing.

### B. Jury Instruction on "Mistake of Fact"

**{¶64}** For his second assignment of error, Torres argues that the trial court should have given a "mistake of fact" jury instruction because there was evidence that he acted

under mistake of fact as to whether K.S. consented to and was aware of his sexual advances. He contends that K.S. had been equivocal in her actions, leading Torres to the erroneous belief that she was interested in him and consented to his sexual advances.

**{¶65}** Because we sustained his first assignment of error and vacated his rape and gross sexual imposition convictions, this assignment of error is moot as to jury instructions concerning those crimes. However, Torres was also convicted of sexual battery in violation of R.C. 2907.03(A)(3). Therefore, we will analyze his second assignment of error in the context of his sexual battery conviction.

### 1. Standard of Review

**{¶66}** "A trial court is obligated to provide jury instructions that correctly and completely state the law. The jury instructions must also be warranted by the evidence presented in a case. The question of whether a jury instruction is legally correct and factually warranted is subject to de novo review." (Citations omitted.) *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 22; *State v. Moore,* 4th, 2020-Ohio-4321, 158 N.E.3d 111, ¶ 16 (4th Dist.). An appellate court will not reverse a conviction due to an erroneous jury instruction unless the error was so prejudicial that it might have induced an erroneous verdict. *State v. Wilks,* 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092 , ¶ 115. ("In examining errors in a jury instruction, a reviewing court must consider the jury charge as a whole and 'must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.' ").

### 2. Legal Analysis of Mistake of Fact

**{¶67}** A "criminal defendant has the right to expect that the trial court will give complete jury instructions on all issues raised by the evidence." *State v. Williford*, 49 Ohio St.3d 247, 251, 551 N.E.2d 1279 (1990); *State v. Mullins*, 2d Dist. Montgomery No. 22301, 2008-Ohio-2892, ¶ 9. However, a court should not give an instruction unless it specifically applies to the case's facts. *State v. McCary*, 2d Dist. Montgomery No. 28250, 2019-Ohio-4596, ¶ 37.

**{¶68}** "Generally, mistake of fact is a defense if it negates a mental state required to establish an element of a crime, except that if the defendant would be guilty of a crime under facts as he believed them, then he may be convicted of that offense." *State v. Hubbard*, 10th Dist. Franklin No. 11AP-945, 2013-Ohio-2735, ¶ 64. "Mistake of fact is widely recognized as a defense to specific intent crimes such as theft since, when the defendant has an honest purpose, such a purpose provides an excuse for an act that would otherwise be deemed criminal." *Id; State v. Zhu*, 10th Dist. Franklin No. 21AP-10, 2021-Ohio-4577, ¶ 48.

**{¶69}** Torres was charged with sexual battery under R.C. 2907.03(A)(3). The relevant section of that statute states: "(A) No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply: * * * (3) The offender knows that the other person submits because the other person is unaware that the act is being committed." The element of sexual battery required the state to prove that Torres knew or had knowledge that K.S. was unaware of his actions. The proposed jury instruction Torres submitted for sexual battery are from 2 OJI-CR 417.05 and state:

> 1. Unless the defendant had the required knowledge he is not guilty of the crime of Sexual Battery.

2. In determining whether the defendant had the required knowledge you will consider whether he acted under a mistake of fact regarding whether [K.S.] was aware of the act that was being committed.

3. If the defendant had an honest belief arrived at in good faith in the existence of such facts and acted in accordance with the facts as he believed them to be, he is not guilty of Sexual Battery as knowledge that [K.S.] submitted because she was not aware the act was being committed is an essential element of that offense.

**{¶70}** The trial court considered the proposed jury instruction and concluded that a mistake of fact instruction would duplicate instructions already given, was not a correct statement of the law, and would tend to confuse and mislead the jury. Furthermore, the court believed that (1) it had already incorporated the essence of the defense of mistake of fact into the court's jury instructions, and (2) the evidence submitted at trial was insufficient to raise the legal issue for a more particular instruction on mistake of fact.

**{¶71}** The jury instructions the trial court gave on sexual battery included the requirement that the state prove beyond a reasonable doubt that Torres knew that K.S. submitted because she was unaware that the act was being committed. The trial court gave the following instruction regarding the knowledge element of sexual battery:

A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result. A person has knowledge of circumstances when he is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of the offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning that fact.

Since you cannot look into the mind of another, knowledge is determined from all of the facts of the circumstances in evidence. You will determine from these facts and circumstances whether there existed at the time in the mind of the Defendant, an awareness of the probability that his conduct would cause this result.

The trial court's jury instruction on knowledge is the instruction provided in 2 OJI-CR

417.11 and is the statutory definition provided in R.C. 2901.22(B) concerning culpable mental states.

**{¶72}** The trial court's jury instruction on knowledge was the legally correct statement of that mental state and provided the jury with the proper instruction. Torres's mistake of fact jury instruction is a legally correct statement of mistake of fact. However, the trial court correctly determined that Torres's request for a mistake of fact jury instruction was not proper as a matter of law because mistake of fact as to whether K.S. was unaware of Torres's conduct was not raised by the evidence. A court should not give an instruction unless it specifically applies to the facts of the case.

**{¶73}** Torres claimed that he acted under mistake of fact because he believed K.S. was not sleeping, was aware of his sexual advances, and consented to them. However, Torres failed to present any evidence of "an honest belief arrived at in good faith." Instead, the facts and circumstances in evidence prove beyond a reasonable doubt that Torres believed there was a high probability that K.S. was asleep, he failed to make an inquiry, and he acted with conscious purpose to avoid learning whether she was asleep.

**{¶74}** K.S. went upstairs to go to bed at approximately 4:30 a.m. after a night of drinking. When Torres sent her a message asking to cuddle, she rejected him and told him "I'm sleeping." K.S. was the first to go upstairs to bed, Harvey went to bed later, and then Griffith went to bed even later. When Torres went upstairs after Griffith had gone to bed, he "knocked on doors" and "yelled for Josh [Griffith]" yet nobody – not Griffith, not K.S., not Harvey – responded to him or opened up their doors. Torres indicated that K.S.'s bedroom door was open about 8 to 10 inches and she was laying facing the wall. Torres

did not knock on her door, he did not ask if he could come in, and he did not announce his presence in any way. Instead, he quietly, stealthily entered her bedroom and laid down next to her. Torres testified that K.S. did not respond with any awareness to his presence in her room nor did she respond with any awareness when he laid down next to her. Her back was to him meaning that he was facing the back of her head when he went into the room and laid down next to her. He did not speak to her to ask her if she was awake. He silently began to touch her hand, "and since she didn't say anything I touch her neck." Torres explained that his progression along K.S.'s body was based on her complete lack of response each step of the way, "First, I touch her hand, there was nothing, then I touch her neck, and there was nothing, and then I touch her breast * * *." At that point, Torres testified that he sensed that K.S. breathing had changed and she moved one of her feet on top of his. Based on this, Torres stated that he believed she was aware of what was happening. However, he did not speak to her to determine if she was awake, nor did he ask her if she was aware of what he was doing to her or if she consented. The facts and circumstances here show that Torres knew with a high probability that K.S. was asleep and he failed to make inquiry – he avoided learning whether she was actually awake and aware of his actions. Torres presented no evidence that he took any good faith actions to establish an *honest belief* that she was awake, aware of his actions, and consented to them. It strains credulity to the breaking point that he would think otherwise. He was not entitled to a jury instruction on mistake of fact – it does not apply to the facts of this case. The trial court gave careful, thorough consideration of this issue and correctly analyzed and applied the law.

{¶75} We overrule his second assignment of error.

## C. Manifest Weight of the Evidence

**{¶76}** For his final assignment of error, Torres argues that his convictions were against the manifest weight of the evidence. Again, we limit our analysis of this assignment of error to his sexual battery conviction as this argument is moot as to his rape and gross sexual imposition convictions.

### 1. Standard of Review

**{¶77}** In determining whether a criminal conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119. To satisfy this test, the state must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt. *See State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304, syllabus; *State v. Harvey*, 4th Dist. Washington No. 21CA3, 2022-Ohio-2319, ¶ 24. Because a trier of fact sees and hears the witnesses, appellate courts court will also afford substantial deference to a trier of fact's credibility determinations. *State v. Schroeder*, 2019-Ohio-4136, 147 N.E.3d 1, ¶ 61 (4th Dist.).

### 2. Sexual Battery Conviction

**{¶78}** Torres argues that the greater weight of the credible evidence adduced at trial demonstrates that he did not act with the requisite mental culpability on the sexual battery count, i.e., that he knew K.S. submitted to sexual conduct because she was

unaware the act was being committed. In particular, he contends K.S. responded when he touch her arm and neck by changing her breathing pattern and moving her foot, "which he interpreted as signs of consent and that she was cognizant of what was happening."

**{¶79}** When we addressed his second assignment of error, we identified the elements of sexual battery and found that Torres presented no evidence that he had an honest belief based on good faith that K.S. was awake, aware, and consenting to his conduct. The entire weight of the evidence proved beyond a reasonable doubt that K.S. was sleeping and Torres made no inquiries to determine otherwise. His belief that she was awake was based on her unresponsiveness to his conduct – a sign of sleep, a subtle change in her breathing pattern, and a foot movement.

**{¶80}** After our review of the record, and after we consider the evidence and testimony adduced at trial and all reasonable inferences therefrom, witness credibility, and the conflicts in the evidence, we do not believe that the jury clearly lost its way so as to create a manifest miscarriage of justice that Torres's sexual battery conviction must be reversed and a new trial ordered. Instead, we believe that the state adduced substantial evidence at trial to prove all of the elements of this offense beyond a reasonable doubt. Thus, we overrule appellant's third assignment of error.

## IV. CONCLUSION

**{¶81}** Accordingly, based upon the foregoing reasons, we hereby reverse in part, and affirm in part, the trial court's judgment. We vacate his convictions on rape and gross sexual imposition and affirm his conviction on sexual battery and remand to the trial court for sentencing on his sexual battery conviction.

JUDGMENT REVERSED IN

PART, AFFIRMED IN PART,
CAUSE REMANDED.

Abele, J., dissenting

**{¶82}** I respectfully dissent.

**{¶83}** I acknowledge that a division of authority exists among Ohio appellate courts on the issue of what acts may constitute the element of force in a prosecution for rape in violation of R.C. 2907.02. In the case at bar, appellee asserts that with "sleeping victims," the element of force need not be overt and physically brutal. I agree. Here, I believe that we should follow the line of cases that would result in an affirmance of appellant's judgment of conviction and sentence.

**{¶84}** Appellant, however, cites two Third District cases to support his argument

concerning the element of force.  In *State v. Wine,* 3d Dist. Auglaize No. 2-12-01, 2012-Ohio-

2837, the defendant argued that the state failed to prove "force" when the adult victim slept

during an act of sexual contact.[2]  *Id.* at ¶ 37.  The court concluded:

> 'subtle and psychological' force found sufficient in *Eskridge* and *Dye* are insufficient here, because S.D. was an adult and Wine was not in a position of authority over S.D.  *Schaim*, 65 Ohio St.3d at 54-55, 600 N.E.2d 661.  Rather, the State was required to prove beyond a reasonable doubt that Wine 'use[d] physical force against [S.D.], or create[d] the belief that physical force [would] be used if [S.D.] [did] not submit' to establish the element of force.

*Id.* at ¶ 47.

The Third District noted that when the victim, asleep and unaware, awoke, the defendant

withdrew his hands and ended the sexual contact. "Significantly, no sexual contact occurred

after S.D. was awake and aware of the sexual contact.  S.D.'s will was not overcome by force

or threat of force, nor did S.D. 'submit' to the sexual contact by force or threat of force."  *Id.*

Further, the court held that the state failed to produce evidence that the

defendant created the belief that physical force would be used if the victim did not submit to

sexual contact.  *Id.*  The court emphasized that, although it "is true that S.D. was in a state

of fear and duress after she awoke and realized Wine had sexually contacted her, S.D.'s fear

and duress did not *cause* her to submit to the initial sexual contact or any further contact."

*Id.* at ¶ 47.

{¶85}  Appellant also points to another Third District case, *State v. Henry,* 3d Dist.

Seneca No. 13-08-10, 2009-Ohio-3535, that involved a sleeping victim who awoke when she

felt a hand under her shorts.  Initially, the victim believed the offender to be her boyfriend and

---

[2]  The use of the term sexual contact rather than sexual conduct stems from the arguable lack of evidence adduced in *Wine* as to whether the defendant actually penetrated the victim's vagina.

several times removed the hand. However, after the defendant touched the victim's vagina multiple times and attempted to penetrate her, the victim "woke completely up," realized the man was not her boyfriend, pushed the man off the bed and ran screaming from the room. *Id.* at ¶ 5. The Third District observed that the defendant made no comments or threats to the victim and the state adduced no evidence that the defendant applied force to the victim's body or clothing. As soon as the victim did become aware and pushed the defendant, he left the room. Also, the state adduced no evidence that the defendant attempted to restrain the victim. Based upon those facts, the *Henry* court's plurality opinion concluded that the defendant's actions did not constitute force sufficient to overcome the victim's will. *Id.* at ¶ 31.

{¶86} In the case sub judice, the trial court overruled appellant's Crim.R. 29 motion for judgment of acquittal and referred to three Fourth District cases - - *State v. Burton,* 4th Dist. Gallia No. 05CA3, 2007-Ohio-1660, *State v. Umphries,* 4th Dist. Ross No. 11CA3301, 2012-Ohio-4711, and *State v. Mynes*, 4th Dist. Scioto No. 12CA3480, 2013-Ohio-4811. In *Burton*, the defendant manipulated the child victim's clothing and sleeping body into a position to facilitate sexual conduct. *Id*. at ¶ 42. This court held that "[t]his physical manipulation required force, however minimal, beyond that inherent in the act of rape itself," and also concluded that additional factors contributed to the finding of force, including "the victim's will was also overcome by Burton's relative size and age, by the victim's fear resulting from his lack of understanding of an orgasm and his high level of intoxication, and by Burton's position of authority established via his law enforcement officer training, his ability to drive, his relationship with [the victim], and his ability to provide the victim with an expensive gift."

*Id.*

**{¶87}** In *Umphries,* the victim awoke to discover her uncle on top of her with his hands down her pants. *Id.* at ¶ 5. After Umphries removed the victim's pants and underwear, he placed his penis inside the victim while she "begged him to stop." *Id.* This court concluded that sufficient evidence existed to support the view that appellant compelled the victim to submit by force or threat of force. *Id.* at 19.

**{¶88}** In *Mynes*, this court concluded that the state adduced sufficient evidence to prove that Mynes purposely compelled the victim, a 17-year-old, to submit by force or threat of force. *Id.* at ¶ 17. The victim knew the defendant, and considered him as a brother. *Id.* at ¶ 17. When viewed in a light most favorable to the prosecution, this court concluded that a rational trier of fact could have found that Mynes purposely compelled the victim to submit by force or threat of force. *Id.*

**{¶89}** Appellant argues that the case at bar is analogous to *Henry*. However, as appellee points out, this court in *Mynes* rejected the *Henry* plurality opinion and determined "there was no majority in *Henry* and as the dissent recognized, 'having been concerned with in judgment only, the lead opinion sets no precedent or binding rule of law beyond the impact upon the parties in this case.' *Henry* at ¶ 42 (Shaw, J., dissenting)." *Id.* at ¶ 19. Moreover, in *Mynes* this court found the *Henry* dissent more persuasive. *Id.* at ¶ 19.

**{¶90}** Other Ohio courts have held that the manipulation of a sleeping victim's clothing, in order to facilitate sexual conduct, may constitute sufficient force under the statute. Force is defined as <u>any</u> violence, compulsion, or constraint physically exerted by <u>any</u> <u>means</u> upon or against a person or thing. R.C.2907.01(A)(1) (emphasis added). Furthermore, force

need not be overt or physically brutal.  *State v. Burton*, citing *State v. Eskridge* (1988), 38 Ohio St.3d 56, 59, 526 N.E.3d 304 and *State v. Milam*, 8th Dist. No. 86268, 2006-Ohio-4742. For a sleeping victim, only minimal force is required to manipulate a victim's clothing or body to facilitate an assault.  *Burton*, citing *State v. Lillard,* 8th Dist. Cuyahoga No. 69242, 1996 WL 273781 (May 23, 1996).

{¶91}  For example, in *State v. Clark*, 8th Dist. No. 90148, 2008-Ohio-3358, the 19-year-old victim lived with her sister, the defendant's girlfriend.  The victim, in a deep sleep, awakened with a finger in her vagina and observed the defendant on her bed.  The victim told the defendant it was wrong to touch her and, when asked what he was doing, the defendant exited the room.  The evidence showed that the defendant had to move clothing to commit the sexual act.  *Id.* at ¶ 6.  A month later, the victim, again in a deep sleep, felt her pajama bottoms tighten and twist, and a finger inserted inside her vagina.  When she awoke, the defendant sat on her bed with his hand on her vagina.  When asked why he was doing this, the defendant walked out.  *Id.* at ¶ 7.  The Eighth District observed that, on the two occasions when Clark inserted his finger inside the victim's vagina, he manipulated clothing to engage in the act and the court had previously held that "the manipulation of a sleeping victim's clothing in order to facilitate sexual conduct constitutes force."  *Id.* at ¶ 17.  Further, "[i]n the situation where the victim is sleeping and thus not aware of the defendant's intentions, only minimal force is necessary to facilitate the act."  *Id.*  Thus, the court concluded that, when the victim awakened to find her clothing manipulated and the defendant's finger inside her vagina, the state sufficiently established the element of force.  *Id.* at ¶ 19.

{¶92}  In *State v. Fortson*, 8th Dist. Cuyahoga No. 92337, 2010-Ohio-2337, the victim,

a female inmate, testified that on multiple occasions she awoke to find the defendant, a male corrections officer, penetrate her vagina with his fingers, perform oral sex, and put his exposed penis near her face and mouth. *Id.* at ¶ 73. The court found that "[a]lthough there was no evidence in the instant case that the defendant removed or manipulated the rape victim's clothing while she was sleeping, we find that a rational trier of fact could have inferred that the defendant must have used minimal force to facilitate sexual conduct with a sleeping [person]." *Id.* at ¶ 75. *See also, State v. Johnson*, 2d Dist. Green No. 2009-CA-38, 2010-Ohio-2920, ¶ 18, (defendant pushed aside victim's shorts and underwear) quoting *Clark, supra,* at ¶ 17 (defendant pushed aside victim's nightgown and underwear and placed finger inside victim's vagina); *State v. H.H.*, 10th Dist. Franklin No. 10AP-1126, 2011-Ohio-6660, ¶ 12 (defendant removed victim's pants and underwear); *State v. Graves*, 8th Dist. Cuyahoga No. 88845, 2007-Ohio-5430, (victim awoke to find pants and underwear pulled to knees and wet substance on her thighs, shirt, and seat); *State v. Simpson,* 8th Dist. Cuyahoga No. 88301, 2007-Ohio-4301, ¶ 50 (defendant manipulated sleeping victim's clothing and body to make victim accessible for assault); *State v. Lillard,* 8th Dist. Cuyahoga No. 69242, 1996 WL 273781 (May 23, 1996) (victim awoke to find covers removed, robe and legs opened, and defendant looking at and feeling her vagina); *State v. Sullivan*, 8th Dist. Cuyahoga No. 63818, 1993 WL 398551 (Oct. 7, 1993)(victim awoke to find underwear pulled down and defendant's mouth on her vagina).

{¶93} "It is well settled that the testimony of a rape victim, if believed, is sufficient to support each element of rape." *State v. Carpenter*, 2d Dist. Clark No. 2016-CA-66, 2017-Ohio-8905, ¶ 28; *Dyer* at ¶ 20. Further, the Ohio Supreme Court has held that "force can be

inferred from the circumstances surrounding sexual conduct * * *." *Schaim*, 65 Ohio St.3d at 55; *State v. Hartman,* 8th Dist. Cuyahoga No. 105159, 2018-Ohio-2641, ¶ 23. Moreover, as noted above, "[i]n the situation where the victim is sleeping and thus not aware of the defendant's intentions, only minimal force is necessary to facilitate the act." *Clark*, *supra,* at ¶ 17.

**{¶94}** In the case sub judice, throughout the evening the appellant on multiple occasions expressed his desire to engage in sexual relations with the victim. However, the victim repelled his advances and the other witnesses explicitly told appellant that the victim had no reciprocal interest. Nevertheless, the appellant relentlessly pursued the victim and, in the early morning hours the victim testified she awoke to find appellant's finger inserted into her vagina. At that point, she pushed appellant, yelled twice at appellant and he responded, "no, come cuddle with me." After my review, I believe that the victim's testimony, if believed, constitutes sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that appellant engaged in sexual conduct with the victim by purposefully compelling her through force. Although I concede that the testimony adduced at trial suggests appellant may not have used a great amount of force, "[t]he word "any" specified in the definition of "force" recognizes that various crimes upon various victims require different degrees and manners of force.'" *Umphries,* ¶ 17, quoting *Sullivan*, 8th Dist. Cuyahoga No. 63818, 1993 WL 398551, *4(Oct. 7, 1993). I also believe that any rational trier of fact could have inferred that appellant used at least minimal force to manipulate the sleeping victim's clothing to facilitate sexual conduct. *Fortson* at ¶ 75. The victim testified that she wore cut-off sweatpant shorts to sleep. In my view, it strains credulity and the laws of gravity to suggest

that the victim slept with her vagina exposed.  Here, the trial court also determined that the following factors indicated that sufficient evidence of force exists: 1) the victim had to push the defendant off of her, 2) the defendant continued to try to lie down next to the victim and wanted to "cuddle," and 3) the victim had to yell at appellant and use profanity.  After my review of the record, and in the light most favorable to the state, I agree with the trial court's conclusion and I believe that sufficient evidence exists to establish the element of force for the commission of rape and gross sexual imposition.

**{¶95}** Therefore, based upon the foregoing reasons, I would overrule appellant's assignments of error concerning his convictions for violations of R.C. 2907.02(A)(2) and 2907.05(A)(1).

## JUDGMENT ENTRY

It is ordered that the judgment be reversed in part, affirmed in part, and the cause remanded for a modification of conviction and resentencing. Appellee to pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Wilkin, J.: Concurs in Judgment and Opinion.
Abele, J.: Dissents with Dissenting Opinion.

For the Court

BY:_____
    Michael D. Hess, Judge

## NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.